**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **DANIELLE PECK, Individually and on behalf of others similarly situated,** ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) | **Case No. 4:21-cv-00834-AGF** |
| **MERCY HEALTH, MERCY HEALTH FOUNDATION, and MHM SUPPORT SERVICES,** ) ) ) ) | |
| **Defendants.** ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
DECERTIFY THE CONDITIONALLY CERTIFIED COLLECTIVE ACTION**

On December 27, 2022, the Honorable Ronnie L. White conditionally certified a wage and hour collective (Doc. #90) based on the assertion by Plaintiff Peck's counsel that "[Mercy's] automatic deductions have perverted the time keeping system by forcing workers to beg and plea for erratic restorations of time until they are ultimately beaten into submission and surrender to systematic wage theft" after Mercy deducted 30 minutes from hourly employees' pay for lunch and refused to pay them overtime if they actually worked through lunch. (Doc. #37-1, p.1). Thereafter, 3,765 individuals opted in to this collective action. *See* Declaration of Amber Hunsaker ("*Hunsaker Decl.*") at ¶ 6.

However, discovery has proven that the experience of the collective members was anything but "systematic" and that 61.41% of the Opt-In Plaintiffs ***were paid*** for meal breaks when they canceled their meal period deduction and informed Mercy that they worked through their lunch. *See* Declaration of Magdalena Sudibjo ("*Sudibjo Decl.*") at ¶ 11. Moreover, when Mercy asked for depositions of some of the Opt-In Plaintiffs, ***52*** of those selected dropped out of the collective rather than testify under oath to corroborate Peck's allegations, leaving 3,713 remaining Opt-In Plaintiffs. *Hunsaker Decl.* at ¶ 6. The 35 Deponents who ***did testify*** had vastly different

experiences. Some knew that Mercy had a policy requiring that employees record their time accurately so they could be paid when they worked a meal break; others claim not to have had such knowledge. *See* Exhibit AAA (compiling and summarizing the Deponents' testimony on key issues). Employees in certain departments never had issues taking interrupted meal breaks, while in other departments employees more often had to cancel a meal break to address urgent patient needs. *Id.* Some class members worked through meal breaks and did not accurately report their time unbeknownst to their supervisors—meaning they never gave Mercy a chance to pay them. *Id.* A few class members identified individual supervisors who allegedly violated Mercy's policy by telling them not to record meal breaks. *Id.* But contrary to that testimony, the time records of many of those same employees indisputably show that ***did*** f***requently report*** working during a meal break and that Mercy properly paid them. *Id.*; *Sudibjo Decl.* at ¶¶ 5-14.

There is no dispute that Mercy's policy of automatically deducting meal periods and paying employees when they reported skipping a meal period does not violate the FLSA. Mercy provided at least three simple ways for employees to cancel the meal break deduction: pressing a button at the electronic time clocks, emailing an exception form to the payroll department, or editing their actual time worked at the time clocks or through an app on employees' smartphones. *See* Deposition of Jill McCart, Part 1 ("*1st McCart Dep.*") at 83-84, 201, 201-214; *4th McCart Decl.* at ¶ 7, Exhibit UKG. When employees reported that they worked during a meal break, they were paid, "that's plain and simple." *1st McCart Dep.* at 83-89; *2nd McCart Dep.* at 96-101.

Accordingly, the Opt-In Plaintiffs cannot carry their heavy burden of showing that—even though Mercy had a lawful policy—they were all similarly situated with respect to not being paid for their skipped meal breaks. As laid out in detail below, the Deponents' testimony is too individualized and varied to meet that burden for the entire collective of Opt-In Plaintiffs. This Court, therefore, should decertify this conditionally-certified class.

2

## PROCEDURAL BACKGROUND

Plaintiff Peck filed her Collective and Class Action Complaint on July 9, 2021, asserting collective and class action claims under the FLSA, Oklahoma Protection of Labor Act, and Oklahoma common law. (Doc. #1). Plaintiff alleged that Defendants maintained a meal break deduction policy, under which Defendants' computerized timekeeping system automatically deducts one half-hour from hourly-paid employees' paychecks each day for a meal break, despite Mercy's knowledge that hourly employees regularly work during their meal breaks. (*Id.*, ¶ 3). With respect to Plaintiff's FLSA claim, Plaintiff asserts that this policy resulted in non-exempt employees not receiving the requisite overtime compensation. (*Id.*, ¶¶ 44-46). On September 7, 2021, Defendants filed an Answer denying the material allegations in the Complaint. (Doc. #15).

Plaintiff subsequently filed an amended Complaint and moved for Conditional Collective Certification and Court-Supervised Notice to Potential Opt-In Plaintiffs Pursuant to 29 U.S.C. § 216(b). (Doc. #23 and #37).After briefing by the Parties regarding Plaintiff's Motion for Conditional Certification, this Court (J. White) issued a Memorandum and Order granting Plaintiff's Motion, in part, and conditionally certified an FLSA collective class consisting of:

> All hourly-paid employees of the Defendants who were or are subject to the automatic meal break deduction policies at any time on or after three (3) years prior to the date on which the Court approves the collective certification.

(Dkt. No. 90 at 14). Plaintiff never moved for certification of her state law class claims.

The parties agreed that Mercy could depose 35 opt-in plaintiffs (a 1% representative sample of the Opt-In Plaintiffs), and Plaintiff would take the deposition of Defendants' Rule 30(b)(6) corporate representative(s). Mercy further agreed to conduct an ESI search for relevant documents, which resulted in Mercy producing over 14,000 pages of documents. The parties have now fully completed the agreed-upon discovery and this matter is ripe for this Court's consideration.

3

## LEGAL STANDARD

A collective action under the FLSA "may be maintained 'by one or more employees for and in behalf of himself or themselves and other employees similarly situated.'" *Arnold v. DirecTV, LLC*, Case No. 4:10-CV-352-JAR, 2017 U.S. Dist. LEXIS 48472, at *5 (E.D. Mo. Mar. 31, 2017) (quoting 29 U.S.C. § 216(b)). The FLSA does not define the term "similarly situated." *Id.* Courts within the Eighth Circuit have applied a two-step process to certifying a collective action under the FLSA. *Id.* At the conditional certification stage, the plaintiff's "burden is not rigorous." *Id.* They must only show a "'colorable basis for their claim,' and 'that a class of similarly situated plaintiffs exist.'" *Id.* At the decertification stage, "courts apply a stricter standard, including making a 'factual determination' as to whether the opt-in plaintiffs are similarly, but not necessarily, identically, situated." *Davenport v. Charter Communs., LLC*, Case No. 4:12CV00007-AGF, 2017 U.S. Dist. LEXIS 31076, at *89 (E.D. Mo. Mar. 6, 2017). "Plaintiffs may be similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *Id.* Typically, "three factors are analyzed based on information gained from discovery: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant that appear to be individual to each plaintiff, and (3) fairness and procedural considerations." *Arnold*, 2017 U.S. Dist. LEXIS 48472, at *5; *see also Davenport*, 2017 U.S. Dist. LEXIS 31076, at *89-90. The decision to certify or decertify an FLSA collective action is within the district court's discretion. *Id.*

## FACTUAL BACKGROUND

### A. Mercy operates a health system across four states with 58,000 employees.

Defendant Mercy Health is the non-profit parent corporation of hospitals, clinics, doctors' offices, and other healthcare providers primarily located in Missouri, Arkansas, Oklahoma and Kansas. *1st McCart Dep.* at 29-36. Mercy Health and Mercy Health Foundation do not have any

4

employees. *4th McCart Decl.* at ¶ 3.  Defendant MHM Support Services employs individuals who work at entities in the Mercy Health system. *1st McCart Decl.* at ¶ 8. During the relevant time period, Mercy employed approximately 58,000 hourly employees, and there are about 34,000 hourly employees at any given time, occupying 1,663 discrete job titles and working in 2,300 departments, reporting to 1,900 different supervisors, and at 470 different physical locations. *1st McCart Decl.* at ¶ 4; *2nd McCart Decl.* at ¶ 4. The Opt-In Plaintiffs themselves occupy 339 unique positions at 238 distinct physical locations. *Hunsaker Decl.* at ¶ 7.

**B. Mercy's Written Policies Comply with the FLSA.**

During the entire relevant time period, Mercy maintained a "Non-Exempt Rest and Meal Breaks" policy under which non-exempt employees were permitted—and highly encouraged—to take reasonable rest and meal breaks in accordance with the policy and applicable department guidelines. *1st McCart Decl.* at ¶ 5, Exhs. A, B and C (versions with different effective dates) ("Meal Break Policy"); *1st McCart Dep.* at 41-43. Employees are encouraged to take meal breaks away from their work areas and are required to accurately record their time. *Id.* Employees are to be completely relieved of their duties during meal breaks, and, if an employee gets interrupted to perform any work during his/her meal break, or if the employee misses a meal break, the employee must be paid for the meal break time. *1st McCart Decl.* at ¶ 5, Exhs. A, B and C.

Importantly, the Meal Break Policy clearly states in bold, "***Under no circumstances are co-workers permitted to work off-the-clock.***" *Id.* It then further states, "If a co-worker is called back to work prior to the end of his/her meal break or otherwise is unable to take his/her full meal break, the co-worker is required to report any time worked during that scheduled break." *Id.* Finally, "if a meal break cannot be taken, co-workers must cancel the auto meal deduct at the time clock at the end of the shift [or] submit an exception form to their department Kronos editor for all cancelled meal breaks." *Id.; 1st McCart Dep.* at 149-155, 166-167. This mechanism ensures that everyone is properly paid. *1st McCart Dep.* at 83-89; *2nd McCart Dep.* at 96-101.

**C. To track time worked by employees, Mercy uses industry-leading software that is configured to pay employees for any meal break that they miss or is interrupted.**

Like other large organizations in our technological age, to pay employees correctly and at scale, Mercy partners with a payroll software company, UKG (formerly Kronos). *1st McCart Decl.* at ¶ 6; *3rd McCart Decl.* at ¶¶ 3-4.

When meal breaks are permitted, Mercy's Kronos may be set up for designated hourly employees to automatically deduct time (either 30 or 60 minutes depending on the employee's schedule) for meal breaks after the employee has worked five (5) consecutive hours, and again after working fifteen (15) consecutive hours. *1st McCart Decl.* ¶ 7 and *Exhs. A, B and C*; *2nd McCart Decl.* ¶¶ 6-7.

In order to cancel the meal break deduction, an employee need only enter a cancellation of the deduction in the timekeeping system, which can easily be done with the click of a button. Mercy intentionally made this process no more difficult for employees than clocking in and out, and canceling does not require supervisor approval and supervisors cannot prevent employees from canceling a meal break deduction at the time clock. *2nd McCart Decl.* at ¶¶ 7-8; *2nd McCart Dep.* 100-102. When employees use these available mechanisms to report their time worked–including a canceled meal break–Mercy pays them for that time and counts it towards their overtime. *1st McCart Dep.* at 207-209; *2nd McCart Dep.* generally.

**D. The pervasive variations in work settings mandate individualized inquiries and preclude imputation of any Opt-In Plaintiff's experience to another.**

At every angle, disparate circumstances eclipse any claim of similarity. The Deponents' testimony confirms material differences in where they worked, what they did, who supervised them, how they handled meal periods, whether they used the cancellation process, why they sometimes worked through lunch, and whether they ever crossed the 40-hour threshold. The Opt-In Plaintiffs can be categorized as follows:

- Direct patient care vs. not: 46% no direct patient care, 54% direct patient care

6

- In-person vs. remote: 17% remote, 83% in-person
- Frequency of cancellation: 31% "often," 37% "sometimes," 26% "rarely or never," 3% "does not recall," 3% "not applicable in current role because did not miss meal breaks"
- Process used to cancel: 46% cancel via time-clock system, 14% cancel via time clock or filling out a form, 11% cancel by filling out a form, 6% cancel by emailing or informing their supervisor, 3% cancel via time clock system or by writing in a book

*Exhibit AAA.* The Deponents' actually canceled meal period deductions at the following rates:

| Deponent Name | Canceled Deductions | Shifts > 5 Hours | Deponent Name | Canceled Deductions | Shifts > 5 Hours |
|---|---|---|---|---|---|
| Banta | 0 | 15 | Nunley | 315 | 579 |
| Barker | 130 | 132 | Peck | 25 | 234 |
| Burkett | 115 | 336 | Powell | 43 | 589 |
| Donaldson | 71 | 95 | Ray | 148 | 475 |
| Donnelly | 1 | 575 | Rhoades | 0 | 4 |
| Edmunds | 2 | 131 | Robinson-McNeese | 2 | 138 |
| Fleming | 148 | 223 | Rosikhina | 5 | 78 |
| Fluhr | 9 | 236 | Sanders | 0 | 388 |
| Gessel | 71 | 79 | Schwer | 51 | 67 |
| Giacomo | 66 | 480 | Sloan | 109 | 688 |
| Gibbs | 0 | 355 | Smith | 510 | 562 |
| Henson | 14 | 115 | Taylor | 1 | 322 |
| Hillhouse | 176 | 437 | Thibault | 60 | 70 |
| Lartonoix | 21 | 270 | Thomas | 86 | 837 |
| London | 93 | 102 | Watson | 0 | 16 |
| Marvelle | 0 | 125 | Webster | 0 | 181 |
| Nance | 75 | 123 | Weseman | 16 | 509 |
| Newton | 45 | 425 | | | |

*Sudibjo Decl.* at ¶ 5, *Exh. A.* These variations—ranging from zero cancelations over 388 shifts to 510 cancelations over 562 shifts (*Id.*)—mandate individualized inquiries and foreclose any collective-wide adjudication for the 3,713 Opt-In Plaintiffs.

## 1. The Evidence Demonstrates that Employees Were Subject to Varying Practices Related to the Frequency and Ability to Take Uninterrupted Meal Breaks.

The Opt-In Plaintiffs' testimony shows no consistent experience regarding meal breaks. Employees worked in diverse settings, departments, and roles across Mercy, resulting in significant differences in how and when they could take uninterrupted breaks.

Even among Opt-In Plaintiffs holding the ***same position***, experiences varied widely. For example, **Belinda Robinson-McNeese**, a Phlebotomist at Mercy Hospital South, testified that she missed her meal break at least once a week, while **Andrea Sloan,** a Phlebotomist at Mercy Clinic

Pulmonology in Fort Smith, Arkansas, testified that she *always* received a full lunch because her supervisor shut down the clinic so everyone could eat. (Robinson-McNeese Dep. 40:11-19; Sloan Dep. 21:6-8; 50:9-15). Notably, even a single Opt-In Plaintiff's experiences with meal breaks varied depending on the unit, role, or location where they worked on a given day. For example, **Rebecca Burkett,** a Registered Nurse ("RN"), testified that her ability to take a full break varied by department—she typically received one while working in the Neuro Step-Down Unit but rarely did so in the Medical Step-Down Unit. (Burkett Dep. 14:17-15:4, 20:11–25). **Thomas Ray**, a Licensed Practical Nurse ("LPN") who worked in both the Co-Worker Health and Emergency Room departments in Oklahoma City, stated that he had difficulty taking uninterrupted meal breaks while working in Co-Worker Health, but always took a lunch in the Emergency Room. (Ray Dep. 13:15–25; 20:22-21:2; 21:8-15). Similarly, **Charlene Powell**, a Registered Nurse who worked in both the ICU and the Dialysis Unit in St. Louis, testified that she had no issues taking meal breaks in the Dialysis Unit but frequently missed meals while working in the ICU. (Powell Dep. 14:16–23; 16:4–5; 59:2–10). **Bailey Rhoades**, a housekeeper, testified that she received a full break when working at Fort Smith, Arkansas, but sometimes missed meal breaks when working weekends in Joplin, Missouri. (Rhoades Dep. 14:17-20; 21:7–22:13).

Likewise, the disparities among Opt-In Plaintiffs are substantial when comparing employees in different roles and locations. For example, **Brian Newton,** who has worked from home since March 2020 as a Credentialing Analyst, testified that he typically receives a full lunch break every day. (Newton Dep. 14:19-20, 101:20-25). **Jeff Mattson**, who supervised the overnight shift in in-patient behavioral health units, testified there was ample down time overnight so his employees usually could take a lunch break whenever they wanted. (Mattson Dep. 11:10-21, 24:3-11). In contrast, **Plaintiff Peck**, who worked as a Unit Registration Representative at Mercy's hospital in Oklahoma City, claimed that she missed her meal break on virtually every shift. (Peck Dep. at 29:1-8; 83:19-22). **Barbara Hulsey**, a float pool supervisor in Fort Smith, Arkansas,

observed employees not getting a meal break during the COVID pandemic. (Hulsey Dep. 11:19–21, 14:8-10, 89:22-90:5). As a result, she would make a note that they did not receive a lunch so she could cancel their deduction. (*Id.*)

The testimony demonstrates that the frequency and ability of Opt-In Plaintiffs to take full, uninterrupted meal breaks varied widely across departments, roles, shifts, and locations. These individualized differences make clear that no single, uniform practice governed employees' meal breaks at Mercy; rather, whether an employee missed or received a full meal break depended on their specific circumstances. The only thing that did not vary among the Opt-In Plaintiffs was how easy it was to cancel their automatic meal period deductions when they skipped, or got interrupted during, their meal period.

## 2. The Opt-In Plaintiffs' Knowledge Regarding Mercy's Policy Varied Significantly.

The Opt-In Plaintiffs' testimony reflects a wide variation in their understanding of Mercy's meal break policy and their ability to cancel automatic meal break deductions. Some Opt-In Plaintiffs testified that they were aware of the cancellation process from the outset of their employment or shortly thereafter. (Fleming Dep. 40:2–7; Banta Dep. 20:9–11; 38:4–20; Donnelly Dep. 35:16–36:2; Gessel Dep. 21:8–12; Hillhouse Dep. 30:5–8). Others stated that they did not learn of their ability to cancel missed meal breaks until well after their employment started. (Henson Dep. 45:21–25; Barker Dep. 61:20–62:1; 62:16–22; Donaldson Dep. 8:25-9:1; 17:16-23; 44:8-11). Opt-In Plaintiff **Kelly-Jean Nance** initially testified that she did not recall ever cancelling a meal break (Tr. 46:5-25), and then—when presented with evidence that she cancelled several meal breaks—she admitted that she had, in fact, cancelled her meal breaks. (Tr. 57:2-18).

Still others testified that, although they were aware of the policy, they were either discouraged from using it or chose not to do so consistently. For example, **Ray** testified that supervisors instructed him not to cancel missed meal breaks, and **Peck** similarly stated that she was told not to cancel and warned of potential repercussions. (Ray Dep. 32:15–16; Peck Dep.

46:1–25). By contrast, several employees, such as **Sharon Giacomo** and **Newton**, acknowledged that they knew how to cancel but did not always utilize the option. (Giacomo Dep. 52:7–10; Newton Dep. 88:10–18).[1]

These variabilities raise a very important question: How can any employee's testimony about *their own* awareness or training regarding Mercy's meal breaks credibly or fairly be imputed to the training experiences of the thousands of other employees in the collective? Because they cannot, decertification must result.

### 3. The Frequency of In-Person Interaction with Supervisors Varied Widely Among Opt-In Plaintiffs, Reflecting Different Levels of Oversight and Knowledge.

The Opt-In Plaintiffs also testified to widely differing experiences regarding the frequency of their in-person interactions with their direct supervisors. The evidence demonstrates that the level of managerial visibility and oversight (or whether they encouraged or discouraged meal period cancellations) varied significantly depending on an employee's department, role, shift, and work location.

Indeed, Several Opt-In Plaintiffs testified that their supervisors would have had no way of knowing if they worked through a meal break unless the employee personally informed them. **Kenda Banta** testified that her supervisor would not have known she missed a meal period unless Banta reported it herself. (Banta Dep. 47:7–14; 59:1–16). Likewise, **Rebecca Burkett, Jonathan Fleming, Brianne Fluhr, Amanda Henson, Peck, Stacey Schwer, Asya Taylor, and Kiesha Watson** each testified that their supervisors had no independent means of knowing whether they

---

[1] Some Opt-In Plaintiffs were internally inconsistent or directly contradicted by Mercy's payroll records, underscoring the need for individualized cross-examination.  For example, **Jordan Donaldson** testified that she did not discover she could cancel meal breaks until the last 9 months of her employment, which would have started in September 2021. (Donaldson Dep. 8:25-9:1; 17:16-23; 44:8-11). However, the records indicate that she started canceling her meal breaks as early as March 2020. (Donaldson Dep. 44:11-45:2). Similarly, **Amanda London's** records reflect that she canceled her meal deductions during nearly every shift. (London Dep. 49:22–50:4). Nonetheless, in her deposition, she disputed canceling her meal breaks that frequently, while simultaneously admitting she could neither recall nor estimate the percentage of cancellations she made. (London Dep. 49:22–51:16). Likewise, Opt-In Plaintiff **Nance** testified that she did not recall ever cancelling the meal break deduction. (Nance Dep. 57:9-14). Yet, Mercy's records show that she cancelled her meal break deduction for almost 61% of her shifts between December 15, 2019, and June 30, 2023. *See Exhibit AAA*, *Sudibjo Decl.* at ¶ 14.

worked through lunch absent the employee notifying their supervisor that they had done so. (Burkett Dep. 46:12–16; Fleming Dep. 64:2–4; Fluhr Dep. 38:22–39:3; Henson Dep. 74:3–10; Peck Dep. 61:1–5; Schwer Dep. 69:10–17; Taylor Dep. 59:18–23; Watson Dep. 58:11–18). **Schwer** specifically acknowledged that her supervisor *encouraged* her to take meal breaks but was not typically on-site and therefore would not know whether she had worked through lunch unless Schwer canceled the automatic deduction. (Schwer Dep. 66:14–16). Similarly, **Taylor** testified that she did not know when or if her supervisors would have known she worked through lunch unless she completed a form documenting the missed break. (Taylor Dep. 59:12–60:2). **Newton**, likewise, testified that his supervisors would have no knowledge of whether he worked through lunch. (Newton Dep. 54:15–55:5). By contrast, **Powell** testified that supervisors were aware when she missed a meal break because she was required to request coverage in order to take one. (Powell Dep. 51:19–22).

Supervisors also testified as to varying interactions with their employees and instructions to their employees regarding scheduling and taking of meal periods. **Mattson** testified he did not assign meal breaks to his employees, while employees reporting to **Hulsey** had assigned lunch times. (Mattson Dep. 40:17-41:7; Hulsey Dep. 23:8-24:5). **Cynthia Long** testified she encouraged employees to take their lunch breaks but did not manage when their breaks occurred. (Long Dep. 42:16-42:3). **Carol Klos** testified she shared in the responsibility, along with the charge nurses and other coworkers, to determine whether the employees had taken their lunch breaks. (Klos Dep. 55:16-24). **Tiana Gasior** supervised employees who "floated" to different departments; thus, her employees had to coordinate with the department in which they were working that day, not with Gasior, to determine their lunch break time, and each department had a different practice for covering lunch breaks. (Gasior Dep. 11:22-12:2, 24:25-26:2, 46:23-47:22).

Collectively, this testimony demonstrates that managerial awareness of missed or interrupted meal breaks varied widely across departments and roles.

### 4. The Opt-In Plaintiffs Offered Widely Differing Reasons for *Why* They Missed or Experienced Meal Break Interruptions.

The Opt-In Plaintiffs' own testimony demonstrates a wide range of explanations for *why* they allegedly missed or worked through their meal breaks. Several deponents attributed any missed or interrupted meal breaks to urgent patient needs or clinical demands. For example, **London,** a LPN, testified that patient needs, alarms going off, and staffing shortages made it difficult to take a full, uninterrupted lunch. (London Dep. 15:16-21; 31:21-32:4). **Powell,** a Registered Nurse, stated that she was frequently pulled away to assist patients. (Powell Dep. 47:17–48:7). **Brianne Fluhr** testified that, as a Speech Pathologist, she frequently needed to observe her patients during mealtimes to assess their mastication abilities, leading to her own inability to take a meal break. (Fluhr Dep. 71:14–72:4).

In contrast, other deponents worked in roles such as office workers, housekeepers, and a variety of other positions with no direct patient care responsibilities. (Rhoades Dep. at 13:10-13; Giacomo Dep. at 23:23-24:2; Lartonoix Dep. at 14:5-7). Several employees in these non-patient roles testified that they *voluntarily* chose to work through lunch, rather than out of necessity or urgent care. For instance, **Yavonka Sanders,** who worked remotely from her home in Florida, testified that she sometimes *chose* to work during lunch but was not required to do so. (Sanders Dep. 29:16–19). Similarly, **Newton**, another remote employee, testified he sometimes felt it was more important to use his meal break to complete tasks. (Newton Dep. 43:10-16). **Sally Lartonoix,** a finance employee, testified that she often missed lunch because she considered taking a lunch break "petty" and had work to do. (Lartonoix Dep. 65:14–66:6). **Giacomo** testified that she often worked during lunch because her office was not private, and people frequently stopped by with work-related questions. (Giacomo Dep. 52:20–22). Some Opt-Ins reported no issues at all taking full, uninterrupted meal breaks. For instance, **Ashley Nunley** testified that her lunch has never been interrupted in her current role as an Exchange Operator. (Nunley Dep. 37:15–17).

The deposition record reveals a patchwork of individual experiences, some driven by patient care demands, others by administrative workload, workplace culture, or voluntary choice, and still others involving no interruptions at all, demonstrating that the collective is not similarly situated or approrpriate to proceed intact.

5. **The Opt-In Plaintiffs Gave Numerous Highly Personal Explanations for Deciding Whether or Not to Cancel a Deducted Meal Break.**

Beyond the already substantial variation in when and why meal breaks were missed or interrupted, the record demonstrates that the decision whether to cancel an automatic meal deduction was itself ***highly individualized***. Employees offered a wide range of explanations for failing to cancel a deducted meal break when they did not receive a full break.

A simple review of the reasoning behind the deposed Opt-In Plaintiffs' decision not to cancel missed or interrupted meals illustrates this. For example, **Giacomo** stated that she chose not to cancel if she subjectively felt she had received "enough" of a break. (Giacomo Dep. 122:7–16). **Newton** testified that his decision not to cancel was his own choice. (Newton Dep. 55:1–5). **Lartonoix** explained that, as a finance department employee, she felt she should "set the bar" and help her department stay within budget. (Lartonoix Dep. 65:14–66:6). **Fluhr** testified that the therapy department was "very different than other departments" and that working through lunch without canceling was common, depending on whether the lunch was missed for meetings or events. (Fluhr Dep. 86:7–87:23.)

Several employees testified they sometimes failed to cancel deducted meal breaks because they simply forgot. (Gessel Dep. 32:21–23; Smith Dep. 56:11-13). **London** testified she sometimes did not cancel because the process was "too much of a hassle." (London Dep. 54:15–22). **Maureen Donnelly,** a Benefits Representative, said she sometimes skipped cancellations because she simply wanted to be done with work. (Donnelly Dep. 13:21-25; 52:25–53:4; 53:22–54:5). Some deponents explained they were unaware of the cancellation process or their ability to

do so, such as **Rhoades**. (Rhoades Dep. 26:23–25). Others claim they refrained from canceling because supervisors or managers explicitly instructed them not to. (Ray Dep. 32:15–16; Peck Dep. 46:1–16). **Schwer** testified that, although she was never explicitly instructed not to cancel, she sometimes refrained from canceling "no lunch" deductions because her department's budget was closely monitored. (Schwer Dep. 64:16–20; 68:17–20).

This testimony paints a picture not of a uniform practice, but of thousands of ***independent judgment calls*** made by individual employees in diverse roles and settings with the ability to easily cancel the auto-deduction.[2] Such variation precludes collective treatment under the FLSA because it demonstrates that the Opt-In Plaintiffs are not similarly situated with respect to how or why any uncompensated meal periods occurred.

### 6. The Opt-In Plaintiffs Worked Highly Variable Schedules and Hours, Further Demonstrating the Individualized Nature of Their Work Experiences.

The Opt-In Plaintiffs testified to significant differences in their schedules, including varying shift lengths, workweeks, and total hours worked. Whether an employee even qualified for overtime, considering any alleged work during unpaid meal breaks, depends on their individual weekly hours (i.e., only if they worked more than 40 hours in a particular week). These substantial variations necessarily require employee-by-employee analysis.

Indeed, some employees testified that they regularly worked 12-hour shifts three days per week, including **Banta, Schwer, Jessica Weseman, Powell, Burkett, and Amanda Henson**. (Banta Dep. 16:24–17:11; Schwer Dep. 35:20–36:8; Weseman Dep. 27:16–28:12; Powell Dep. 23:2–28; Burkett Dep. 19:6–13; Henson Dep. 23:22–24:12). Others worked schedules that

---

[2] Almost all of the Opt-In Plaintiffs testified to having **no knowledge** regarding the meal break practices at locations or in departments other than those in which ***they worked***. (Banta Dep. 29:17-20; Barker Dep. 38:23-39:2; Burkett Dep. 23:3-7; Donaldson Dep. 41:22-42:1; Donnelly Dep. 60:2-6; Edmunds Dep. 28:23-25; Fluhr Dep. 61:14-17; 81:22-25; Gibbs Dep. 53:25-54:2; Henson Dep. 91:6-16; 40:21-25; Hillhouse Dep. 49:25-50:3; Lartonoix Dep. 27:5-8; London Dep. 74:18-75:3; McKinzie Dep. 90:4-10; Nance Dep. 26:18-21; Nunley Dep. 38:11-14; Peck Dep. 99:19-22; Powell Dep. 28:7-9; Rhoades Dep. 43:4-15; Robinson-McNeese Dep. 47:16-18; Roslkhina Dep. 84:13-17; Sanders Dep. 46:17-19; Schwer Dep. 41:4-9; Sloan Dep. 46:11-13; Taylor Dep. 31:13-17; Thomas Dep. 21:18-21; Watson Dep. 37:9-13; Webster Dep. 23:1-3).

fluctuated significantly from week to week. **Rachel Edmunds** testified that she worked up to 60 hours per week for a period, but later her schedule was reduced to 36 to 48 hours per week. (Edmunds Dep. 24:5–18; 48:21–25). **Rennie Barker** testified that she alternated between part-time and full-time schedules. (Barker Dep. 27:4–28:24). Other deponents described schedules that varied based on staffing or operational needs. Jordan Donaldson testified that her weekly hours fluctuated between 16 and 45 hours. (Donaldson Dep. 46:17–20). **Yelizaveta Rosikhina** testified that she sometimes worked fewer than 40 hours per week and at other times exceeded 40 hours. (Rosikhina Dep. 30:6–12). **Watson** explained that she worked three days a week and four days in other weeks and often picked up extra shifts that pushed her beyond 40 hours. (Watson Dep. 24:23–25:4). **Eunise Webster** testified that she did not have a fixed schedule. (Webster Dep. 33:19–21).

In summary, the deposition testimony reveals that the Opt-In Plaintiffs' work schedules and hours varied significantly, from part-time and variable shifts, to full-time, to three 12-hour shift schedules. These individualized differences determine whether an employee could even qualify for overtime in a given week and underscore that such issues cannot be resolved through collective proof.

## **LEGAL ARGUMENT**

### I.    **Mercy Maintains a Policy That Complies With the FLSA.**

During the relevant time period, Mercy maintained a Meal Break Policy under which non-exempt employees are permitted to take reasonable rest and meal breaks in accordance with the policy and applicable department guidelines. *1st McCart Decl.*, at ¶ 5 and *Exhs. A-C.* Employees are encouraged to take meal breaks away from their work areas and are required to accurately record their time. *Id.* When meal breaks are permitted, Mercy's Kronos time-keeping system may be set up to automatically deduct time (either 30 or 60 minutes depending on the employee's schedule) for meal breaks after the employee has worked five consecutive hours, and again after working fifteen consecutive hours. *Id.* The Meal Break Policy also states that while employees

are to be completely relieved of their duties during meal breaks, if the employee gets interrupted to perform any work during his/her meal break, or if the employee misses a meal break, the employee must be paid for the meal break time. *Id.* To be paid for the meal break, the employee is required to enter a cancellation of the automatic deduction in the Kronos time-keeping system, clock the time as worked, or otherwise note the time in his/her time records so that Mercy can ensure the employee is properly paid.[3] *Id.* Importantly, the Meal Break Policy clearly states in bold, "***Under no circumstances are co-workers permitted to work off-the-clock.***" *Id.* It then further states, "If a co-worker is called back to work prior to the end of his/her meal break or otherwise is unable to take his/her full meal break, the co-worker is required to report any time worked during that scheduled break." *Id.* This mechanism ensures that everyone is properly paid. *1st McCart Dep.* at 83-89; *2nd McCart Dep.* at 96-101.

On its face, Mercy's Meal Break Policy is lawful and does ***not*** violate the FLSA or its implementing regulations. In fact, it is well established that automatic meal break deductions are not *per se* unlawful under the FLSA. *See Hamilton v. Diversicare Leasing Corp.*, No. 1:12-CV-1069, 2014 U.S. Dist. LEXIS 139712, at *9 (W.D. Ark. Oct. 1, 2014) ("courts have consistently held that an automatic meal deduction in and of itself does not violate the FLSA."); *Reynolds v. BLM Co., Inc.,* No. 12-CV-1105, 2015 U.S. Dist. LEXIS 198553, at *8 (W.D. Ark. Jan. 21, 2015) (a policy that manually deducts meal breaks "is not a *per se* violation of the FLSA") (citing *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012)). *See also* Wage and Hour Division, U.S. Dep't of Labor, Factsheet No. 53, The Health Care Industry and Hours Worked (July 2009), available at https://www.dol.gov/agencies/whd/fact-sheets/53-healthcare-hours-

---

[3] Mercy's non-exempt employees generally use a time clock to record their start and stop times each shift that they work by clocking in and clocking out. However, some non-exempt employees, depending on their position, use a smartphone application in which they call into an established phone number to clock in and out. (First McCart Dep. 59:12-22). Alternatively, they can email or submit a handwritten adjustment request. (First McCart Dep. 146:15-147:20).

16

worked ("When choosing to automatically deduct 30-minutes per shift, the employer must ensure that the employees are receiving the full meal break."). "Standing alone, an employer policy providing automatic deductions for meal breaks does not violate the FLSA . . . . Therefore, [the] mere adoption of a system that, by default, deducts meal breaks from its employees' compensation does not constitute a unified policy of FLSA violations capable of binding the Plaintiffs together." *Frye v. Baptist Mem. Hosp., Inc.*, 2010 U.S. Dist. LEXIS 101996, at *15 (W.D. Tenn. Sept. 27, 2010); *Kuznyetsov v. West Penn Allegheny Health Sys.*, 2011 U.S. Dist. LEXIS 146056, at *20 (W.D. Pa. Dec. 20, 2011) (granting decertification, noting the employees were subject to the same policy but the application and implementation of the policy was not standard); *Camilotes v. Resurrection Health Care*, 286 F.R.D. 339, 350 (N.D. Ill. 2012) (meal break deduction policy without more cannot bind plaintiffs together).

Since Mercy's Meal Break Policy does not violate the FLSA, Plaintiffs must show that they were all similarly situated in not being paid for their meal breaks notwithstanding Mercy's policy, *i.e.*, that Mercy had a "policy-to-violate-the-policy." *Reynolds*, 2014 U.S. Dist. LEXIS 139712, at *10 (granting motion for decertification). In similar cases, where the record showed that members of the collective had different experiences regarding off-the-clock work, courts have concluded that the FLSA collective action had to be decertified. For example, in *Hamilton v. Diversicare Leasing Corp.*, the court held: "Plaintiffs' case is premised on their assertion that there was a disconnect between the written policy and what happens in practice, however, Plaintiffs provide no direct evidence of a de facto policy to not compensate employees for missed meal breaks or to even discourage employees from seeking compensation." 2014 U.S. Dist. LEXIS 139712, at *10. Similarly, in *Hinterberger v. Catholic Health Sys.*, the Court noted: "Plaintiffs contend the alleged FLSA violations arise from a hodgepodge of procedures implemented at the department level. As such, a determination of the merits is not susceptible to generalized proof,

17

but will require individualized inquiries regarding the procedures in place at each department, and the conduct of individual managers and employees." 299 F.R.D. 22, 55 (W.D.N.Y. 2014).

Like the plaintiffs in *Hamilton* and *Hinterberger*, the Opt-In Plaintiffs' theory of a *de facto* policy to avoid paying for worked time or overtime is unsupported by the Deponents' own testimony and cannot in any way serve as the basis for collective relief. The Opt-In Plaintiffs have not established any basis to conclude that their individualized experiences can somehow serve as a predictor for the experiences of others. As demonstrated below, the Opt-In Plaintiffs cannot show they were similarly situated in not being lawfully paid for their meal breaks.

### A.    The Opt-In Plaintiffs Work in Disparate Employment Settings and Contexts

Given the above statistics, the nature of the allegations, and the deposition testimony of the Opt-In Plaintiffs, it is clear the members of the collective are not similarly situated, and the collective action should be decertified. There is simply no unifying thread regarding the Opt-In Plaintiffs' experiences with the Meal Break Policy that would allow this matter to proceed as a collective action.

This is not a situation where every Opt-In Plaintiff is engaged in direct patient care where the possibility of missing a meal break to address an urgent patient situation is understandable. The opt-in collective is comprised of office workers, housekeepers, and a variety of other positions with no direct patient care responsibilities. (Rhoades Dep. at 13:10-13; Giacomo Dep. at 23:23-24:2; Lartonoix Dep. at 14:5-7). Accordingly, it is not surprising that those opt-in plaintiffs without direct patient care responsibilities have different experiences with respect to their meal breaks than those with such responsibilities and different explanations as to why they would sometimes work through their meal breaks.

For example, Brian Newton worked as a Credentialing Analyst who has worked five (5) days a week from home since March 2020. (Newton Dep. at 11:15-14). When he skipped his meal periods, it was not due to patient care responsibilities but because he felt it was more important to

18

use the meal break to complete assigned tasks. (Newton Dep. at 43:10–16). Similarly, Yavonk Sanders worked as an Inpatient Coder, working remotely from her home in Florida. (Sanders Dep. at 5:15-24). She never worked at any physical Mercy location. (Sanders Dep. at 10:3-6). She testified to missing meal breaks by choice and not because she was prevented from taking a break. (Sanders Dep. at 29:16-18).

Even in those positions with direct patient care responsibilities, the testimony of the opt-in plaintiffs shows that their experiences with meal breaks vary significantly. For example, Thomas Ray worked as a Licensed Practical Nurse in two different departments, Co-Worker Health and the Emergency Room, in Oklahoma City. (Ray Dep. at Tr. 13:15-25). Ray testified that there were issues with him being able to take an uninterrupted meal break while in the Co-Worker Health department, and he claims that his supervisor directed him not to cancel his meal breaks. (Ray Dep. at 21:8-15; 32:15-16). Conversely, when he worked in the Emergency Room, he learned that it was allowed to cancel his automatically deducted meal breaks and he always did so and was correctly paid in that department once he knew. (Ray Dep. at 31:20-32:7).

Charlene Powell was a Registered Nurse who worked in both the intensive care unit and dialysis units in St. Louis. (Powell Dep. at 14:16-23; 16:4-5). She testified to there being no issues with being able to take her meal break when she worked in the dialysis unit. (Powell Dep. at 59:2-10). If there was, she would cancel the meal break deduction. (*Id*). But when she worked in intensive care, she would sometimes need to assist a patient during a meal break and would not always cancel the automatic meal break deduction. (Powell Dep at 45:25–48:7).

To further underscore how disparate the factual and employment settings are for each Opt-In Plaintiff, almost all of the Deponents testified to having no knowledge regarding the meal break practices at locations or in departments other than those in which they worked. (Banta Dep. at 29:17-20; Barker Dep. at 38:23-39:2; Burkett Dep. at 23:3-7; Donaldson Dep. at 41:22-42:1; Donnelly Dep. at 60:2-6; Edmunds Dep. at 28:23-25; Fluhr Dep. at 61:14-17; 81:22-25; Gibbs

Dep. at 53:25-54:2; Henson Dep. at 91:6-16; 40:21-25; Hillhouse Dep. at 49:25-50:3; Lartonoix Dep. at 27:5-8; London Dep. at 74:18-75:3; McKinzie Dep. at 90:4-10; Nance Dep. at 26:18-21; Nunley Dep. at 38:11-14; Peck Dep. at 99:19-22; Powell Dep. at 28:7-9; Rhoades Dep. at 43:4-15; Robinson-McNeese Dep. at 47:16-18; Roslkhina Dep. at 84:13-17; Sanders Dep. at 46:17-19; Schwer Dep. at 41:4-9; Sloan Dep. at 46:11-13; Taylor Dep. at 31:13-17; Thomas Dep. at 21:18-21; Watson Dep. at 37:9-13; Webster Dep. at 23:1-3).Accordingly, the testimony of the opt-in plaintiffs would not have any relevancy outside of the locations or departments in which they worked.

These sorts of disparate factual and employment settings do not support maintaining the certification of this FLSA collective. There is simply no way for this matter to be tried based on representative testimony or with some other proof that could show a violation of the FLSA as to all the plaintiffs. *See Davenport*, 2017 U.S. Dist. LEXIS 31076, at *89 (plaintiffs may be similarly situated when they suffer from a single FLSA-violative policy and "proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs"). Instead, an individualized inquiry into each of the 3,713 Opt-In Plaintiffs' experiences with respect to meal breaks would be required to determine if a violation of the FLSA occurred. In such a situation, courts have found decertification is required.

In *Hamilton*, the plaintiffs alleged that the defendant, which owned and operated healthcare facilities, automatically deducted a 30-minute unpaid meal break from their work hours even when they worked through their break. The court granted conditional certification and approximately 1,592 employees consented to join the lawsuit. The collective included not only certified nursing assistants and licensed practical nurses but other hourly positions "such as kitchen staff, housekeeping staff, maintenance staff, activities coordinators, social services coordinators, bookkeepers, payroll staff, van drivers, receptionists, and admissions coordinators," who worked at facilities in eight (8) different states. 2014 U.S. Dist. LEXIS 139712, at *3.

The court found that "disparate employment settings and job classifications are material in determining whether the Plaintiffs are similarly situated." *Id.* at 9.  In particular, the court found that the deposition testimony of the named plaintiffs "reveals that their experiences with the policy varied greatly." *Id.* at 10.  Specifically, the court noted that: (i) some stated they did not let anyone know when they missed a meal break; (ii) some were paid for at least some of their missed meal breaks but not all of them; and (iii) many indicated that they only used defendant's procedures to report uncompensated overtime some of the time.  *Id.*  The court further held that hourly employees in non-patient care positions "typically are not so intertwined with patient care that the demands of the job would require an employee to miss his or her lunch break." *Id.* at 11.  Accordingly, the court held that the disparate factual and employment settings of the opt-in plaintiffs "weighs in favor of decertification." *Id.* at 12.

**B.    Opt-In Plaintiffs report drastically different frequency of non-payment for skipped meal breaks.**

As a starting point, consider Named Plaintiff Peck worked as a Unit Registration Representative at Mercy's hospital in Oklahoma City. (Peck Dep. at 15:12-17; 16:3-5). She claimed that she missed her meal break ***on virtually every shift*** due to high workloads, short-staffing, and unpredictable work demands.  (Peck Dep. at 83:19-22; 29:1-8). Contrast that with Brian Newton, who worked from home for more than a thousand shifts over a five (5) year period, and his testimony that he "worked through lunch" without canceling the deduction ***less than ten (10) times*** total.  (Newton Dep. at 61:3-10). Ashley Nunley testified that her break was never interrupted in her current role. (Tr. 37:15-17). Andrea Sloan also testified that in pulmonology (her most recent role), her manager would shut down the clinic every day so everyone would get lunch. (Tr. 21:6-8; 49:1-4; 50:11-13).

The frequency with which Opt-In Plaintiffs cancelled the automatic deduction for meal breaks also differs significantly. An analysis of cancelled meal break deductions for each of the

Opt-In Plaintiffs for the period from December 15, 2019 to June 30, 2023, shows its frequent but varied use:  8.98% of shifts (of any length) had canceled meal breaks deductions; 9.30% of shifts exceeding 5.0 hours had canceled meal breaks deductions;  for 38.59% of the Opt-In Plaintiffs, an automatic meal break deduction was never cancelled and, therefore, 61.41% of them affirmatively canceled at least one meal break deduction; 4.78% of such employees had canceled meal break deductions for 50% or more of such shifts. *Sudibjo Decl.* at ¶¶ 8-12.

In *Reynolds*, the court was confronted with a similar collective action brought by CNAs who worked at nursing home.  2015 U.S. Dist. LEXIS 198553.  The defendant maintained a policy that employees were required to clock out for 30-minute meal breaks but, if an employee failed to do so, a 30-minute meal break was deducted from their time.  The defendant, however, maintained a policy under which employees could complete a correction slip if they worked through their meal break. Even though the members of the collective worked at the same facility and answered to the same payroll clerk, the court found that their disparate factual and employment settings weighed in favor of decertification.  The court noted, "[t]he frequency of missed meals breaks, the class members' understanding of [defendant's] policies, and whether Plaintiffs notified payroll varies widely among the putative class members."  *Id.* at *8-9. While there was "evidence of some individual FLSA violations . . . the evidence does not demonstrate similarly situated plaintiffs were subject to a common, FLSA-violating policy or practice."  *Id.* at 11. "A determination of [defendant's] liability would require an individualized inquiry into whether a class member worked off-the-clock, and if so, the amount of time worked, and whether that class member received compensation."  *Id.*  Thus, the court determined that this factor supported decertification. *Id.; see also Arnold,* 2017 U.S. Dist. LEXIS 48472 (granting decertification where disparate factual and employment setting of the plaintiffs demonstrate that plaintiffs "would not be able to testify about a single, uniform policy given each Plaintiff's varied experiences.").

The same conclusion should be reached even more readily here. This extraordinarily large collective is comprised of hourly workers in a multitude of positions – some with and some without patient care responsibilities – who worked in various departments in locations across several states. It is not possible to establish liability through common or representative evidence. Instead, individualized evidence regarding each opt-in plaintiff's experience with meal breaks, why they sometimes worked through their meal breaks, whether they cancelled the automatic meal break deduction, and, if not, why they did not cancel the deduction is essential to establishing liability under the FLSA.

### C.     Mercy Has Legitimate Individualized Defenses for Each Opt-In Plaintiff.

In determining whether Peck and the Opt-In Plaintiffs have satisfied their heavy, second-stage burden, this Court must also analyze whether Mercy's defenses require individualized proof. *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 375 (E.D. Mo. 2014). Unquestionably, Mercy will be required to assert its defenses against each individual opt-in plaintiff. Such individualized defenses include whether (i) Mercy knew or should have known about each opt-in plaintiff performing work during a meal break; (ii) the opt-in plaintiffs were aware of Mercy's meal break policy and reported working through a meal break; and (iii) an opt-in plaintiff worked a sufficient number of weekly hours (i.e., more than 40 hours) for there to be liability for unpaid overtime under the FLSA. As such, any attempt at class-wide adjudication would result in a series of mini-trials, defeating the entire purpose of a collective action.

#### 1.     Mercy Can Refute it Knew or Should Have Known of Alleged Work During at least some of the Meal Breaks.

Under the FLSA, an employer cannot be liable for unpaid work unless the employer "knew or should have known of the employee's work[.]" *Micone v. Levering Reg'l Health Care Ctr., L.L.C.*, 132 F.4th 1074 (8th Cir. 2025). "Under the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-

payment if the employee fails to follow the established process." *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (affirming decertification) (internal citations omitted). This is true because, "[w]hen the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *Id.*

The deposition testimony of the opt-in plaintiffs varies wildly with respect to whether Mercy knew or should have known about them allegedly working through their meal breaks, especially when approximately 18% of the Opt-In Plaintiffs worked remotely at home. *Exhibit AAA*. A comparison of the scenarios is telling:

- Several opt-in plaintiffs testified that their supervisors would have no way of knowing that the opt-in plaintiff worked through a meal break unless the opt-in plaintiff told their supervisor. (Banta Dep. at 59:10-16; Burkett Dep. at 46:12-16; Fleming Dep. at 64:2-4; Fluhr Dep. at 38:22-39:3; Henson Dep. at 74:3-10; Peck Dep. at 61:1-5; Schwer Dep. at 69:10-17; Taylor Dep. at 59:18-23; Watson Dep. at 58:11-18).

- One Deponent, Stacey Schwer, acknowledged that her supervisor encouraged her to take meal breaks and that her supervisor was not typically on-site so she would not know that Schwer had worked through a meal break without Schwer cancelling the deduction. (Schwer Dep. at 66:14-16).

- Kendra Banta testified that she knew how to cancel the meal break deduction, was never told ***not to cancel*** the deduction, and that her supervisor would have no way of knowing she missed a meal break unless Banta told her. (Banta Dep. at 47:7-14; 59:1-16).

- Asya Taylor testified she does not know when or if her supervisors would have known she worked through a meal break unless she completed a form stating that she worked through her meal break. (Taylor Dep. at 59:12-60:2).

- Brian Newton testified that he worked from home ever since the beginning of the COVID-19 pandemic, and his supervisors would not have any knowledge of whether he worked through a lunch break. (Newton Dep. at 54:15-55:5).

- Charlene Powell testified that supervisors were aware when she missed a meal break because she would have to ask for coverage for her meal breaks. (Powell Dep. at 51:19-22).

Accordingly, to determine whether Mercy is potentially liable for work performed off-the-clock during meal breaks would require testimony from each individual opt-in plaintiff addressing

(i) whether their supervisor knew of them performing work during meal breaks; or (ii) whether there were circumstances that could support a finding their supervisor **should have known** that they were performing work during meal breaks.  Without any uniformity on these points, the collective must be decertified.  *See Meadows v. NCR Corp.*, 2020 U.S. Dist. LEXIS 37149, at *26 (N.D. Ill. Mar. 4, 2020) (decertifying collective; noting whether managers had knowledge of off-the-clock work requires individualized inquiry); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 U.S. Dist. LEXIS 146067, at *27-28 (W.D. Pa. Dec. 20, 2011) (individualized defenses, including whether management had knowledge of off-duty work, favored decertification).

### 2.  Mercy can refute whether some of the Opt-In Plaintiffs Were Aware of Mercy's Meal Break Policy.

Mercy produced Meal Break Policy acknowledgments for the vast majority of Deponents. *1st McCart Dep.* at 68-69; *Exh. ACKN*. Nonetheless, the Deponents' deposition testimony regarding their knowledge of the policy and ability to cancel the automatic meal break deduction was wide-ranging. Some Deponents were aware of their ability to cancel the meal break deduction from the start of their employment or shortly thereafter.  (Fleming Dep. at 40:2-7; Banta Dep. 20:9-11; 38:4-20; Donnelly Dep. at 35:16-36:2; Gessel Dep. at 21:8-12; Hillhouse Dep. 30:5-8).  Others testified that they did not become aware of their ability to cancel the deduction until later in their employment.  (Henson Dep. at 45:21-25; Barker Dep. at 61:20-62:1; 62:16-22).  Some opt-in plaintiffs claimed to have been dissuaded from cancelling their meal breaks.  (Ray Dep. at 32:15-16; Peck Dep. at 46:1-25). While other opt-ins testified to being aware of their ability to cancel the deduction but they did not consistently make use of it.  (Giacomo Dep. at 52:7-10; Newton Dep. at 88:10-18).

As noted above, an analysis of cancelled meal break deductions for the period from December 15, 2019, to June 30, 2023, shows the frequent—almost rampant—use of the cancellation procedure. Thes statistics are unsurprising since nothing is complicated about the

procedures involved. Accordingly, despite some testimony from Opt-In Plaintiffs that they belatedly became aware of their ability to cancel meal breaks or were dissuaded from doing so, the data suggests that the opt-in plaintiffs were aware of, and commonly used, the cancellation feature.

In any event, the discordant testimony from Opt-In Plaintiffs regarding their awareness, and use, of their ability to cancel the meal break deduction further supports that the opt-in plaintiffs are not similarly situated and that an individualized analysis of their claims is required.  For example, Named Plaintiff Peck testified that she was told in 2018 not to cancel meal break deductions.  (Peck Dep. at 46:1-16). Peck, however, cancelled her automatic meal break deduction *for 10.68% of her shifts* since December 15, 2019. *Sudibjo Decl.* at ¶ 13. Opt-In Plaintiff Kelly-Jean Nance testified that she did not recall ever cancelling the meal break deduction.  (Nance Dep. at 57:9-14). Yet Mercy's records show that she cancelled her meal break deduction for almost 61% of her shifts between December 15, 2019 and June 30, 2023. *Sudibjo Decl.* at ¶ 14.

Accordingly, to assess any potential liability under the FLSA, Mercy would need to be afforded the opportunity to cross-examine each Opt-In Plaintiff regarding their knowledge, and use, of the cancellation process, which would include questioning each of them regarding the records showing their use of the cancellation process. This simply cannot be done through representative testimony or common proof and requires an individualized inquiry into each Opt-In Plaintiffs' experience with the cancellation process.  This individualized inquiry further supports that the opt-in plaintiffs are not similarly situated and decertification is warranted.

### 3. Mercy can refute whether some Opt-In Plaintiffs Worked More Than Forty Hours Per Week.

Another issue which will require individualized evidence to establish liability is whether an opt-in plaintiff worked enough hours during a workweek, inclusive of any alleged time spent working off-the-clock during meal breaks, to be eligible to receive overtime pay.  Under the FLSA,

an employee can only recover unpaid overtime wages for those workweeks in which the employee has worked in excess of 40 hours in a workweek – and, therefore, is due overtime pay. *Verne v. Queen City Roofing & Contr. Co.*, Case No. 6:17-cv-03051-MDH, 2018 U.S. Dist. LEXIS 241072, at * (E.D. Mo. Feb. 20, 2018). *See Camesi*, 2011 U.S. Dist. LEXIS 146067, at *27-28 (individualized defenses, including whether employees actually worked overtime without compensation, favored decertification); *Jarosz v. St. Mary Med. Ctr.*, 2014 U.S. Dist. LEXIS 133218, at *20 (E.D. Pa. Sept. 22, 2014) (significant differences in the amount of hours worked in a given workweek weighs against finding plaintiffs are similarly situated). In the healthcare industry, it is common for employees to work less than forty (40) hours per week, so any analysis as to whether an FLSA violation has occurred would depend on: (i) how many hours an opt-in plaintiff worked in a given work week; and (ii) how many meal breaks they worked, but were not compensated for, during a given week.

Amongst the opt-in plaintiffs who were deposed, the issue of their weekly work schedules and the need for an individualized analysis of whether they worked more than 40 hours in a given work week repeatedly presented itself:

- Some opt-in plaintiffs testified to working 12-hour shifts, 3 days per week. (Banta Dep. at 16:24-17:11; Schwer Dep. at 35:20-36:8; Weseman Dep. at 27:16-28:12; Powell Dep. at 23:2-28; Burkett Dep. at 19:6-13; Henson Dep. at 23:22-24:12).

- Rachel Edmonds testified to working 60 hours per week for a period of time but then worked 36 to 48 hours per week. (Edmunds Dep. at 24:5-18; 48:21-25).

- Rennie Barker testified to working on both a part-time and full-time basis. She typically worked two 12-hour shifts per week, but she sometimes worked three 12-hour shifts in a week or more. (Barker Dep. at 27:4-28:24).

- Jordan Donaldson testified to working weekly shifts that varied between 16 and 45 hours per week. (Donaldson Dep. at 46:17-20).

- Yelizaveta Rosikhina testified to working a schedule that was sometimes below 40 hours per week and sometimes above 40 hours per week. (Rosikhina Dep. at 30:6-12).

- Kiesha Watson testified to working a schedule of three days per week some weeks and four days per week other weeks, and she sometimes picked up extra shifts that caused her to work more than 40 hours in a week. (Watson Dep. at 24:23-25:4).

Each and every Opt-In Plaintiff whose time records show they worked less than 40 hours in a given workweek would need to provide personalized testimony regarding their meal breaks in that week to determine if there was an FLSA violation for them specifically in any given week.

### 4.  Mercy can undermine credibility of some Opt-In Plaintiffs.

Discovery exposed the critical contradictions that plague the opt-ins' testimony. As this Court has recognized, Mercy "has a right to attack the accuracy of testimony, particularly representative testimony." *White*, 301 F.R.D. at 377. In *White*, the Court determined that "although it [did] not appear that the Named Plaintiffs made any intentional misrepresentations . . . given the Named Plaintiffs' conflicting testimony, Defendants have a right to explore their underlying credibility and/or ability to speak for the FLSA class." *Id.* at *8. Because examining class member credibility involved "individualized inquiry" and posed a "distraction . . . to the underlying issues," an FLSA collective action was deemed inappropriate. *Id.*

As in *White*, the opt-in plaintiffs' testimony is littered with critical contradictions that severely undermine their credibility. For example, Jordan Donaldson testified that he did not discover he could cancel meal breaks until the last 9 months of his employment, which would have started in September 2021. (Donaldson Dep. at 8:25-9:1; 17:16-23; 44:8-11). However, the records indicate that he started canceling his meal breaks as early as March 2020. (Donaldson Dep. 44:11-45:2). Similarly, Amanda London's records reflect that she canceled her meal deductions during nearly every shift. (London Dep. at 49:22–50:4). Nonetheless, in her deposition, she disputed canceling her meal breaks that frequently—while simultaneously admitting she could neither recall nor estimate the percentage of cancellations she made. (London Dep. 49:22–51:16).

Clearly, the claims of these individual opt-ins call out the need for individualized cross-examination. *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 311 (E.D. Pa. 2010) (decertifying

FLSA class and finding that "the testimony offered by plaintiffs in general is plagued by inconsistencies that diminish its reliability and 'show the importance of cross-examination of each plaintiff.'"). The credibility issues, contrary evidence, and otherwise apparent need to individually examine the allegations made by Plaintiff and other opt-ins makes collective adjudication impossible, and the collective should be decertified. *White*, 301 F.R.D. at 376-377.

### D.    Fairness and Procedural Considerations Dictate Decertification.

"When ruling upon a decertification motion, courts should consider whether proceeding as a collective action 'comports with the purposes of the FLSA by balancing the benefits of a reduction in the cost to individual plaintiffs, and any increased judicial utility that may result from the resolution of many claims in one proceeding, with the cost of any potential detriment to the defendant and the potential for judicial inefficiency that could stem from collective treatment.'" *Hamilton*, 2014 U.S. Dist. LEXIS 139712, at *14 (quoting *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1025 (D. Minn. 2004)); *see also Reynolds*, 2015 U.S. Dist. LEXIS 198553, at *12 (same). Put differently, a "court should consider the primary objectives of allowance of a collective action under § 216(b), namely (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Arnold*, 2017 U.S. Dist. LEXIS 48472, at *29 (internal quotations omitted).  Here, given the disparate factual and employment settings and individual defenses, it is simply not possible to adjudicate the claims of the 3,713 Opt-In Plaintiffs in one proceeding.

Here, collective adjudication would infringe upon Mercy's due process right to individualized cross-examination of each opt-in. *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 371-73 (D.N.J. 1987); *Gatewood v. Koch Foods of Miss., LLC*, 2009 U.S. Dist. LEXIS 113896, at *71-72 (S.D. Miss. Oct. 20, 2009) (decertifying class due to "serious fairness issues."). Mercy's constitutional right to a fair opportunity to defend itself would be seriously impaired if not

decertified. On the other hand, decertifying the class would not unfairly disadvantage Plaintiff or any of the Opt-In Plaintiffs. Their claims would be dismissed without prejudice, and they would retain the right to pursue their claims individually should they choose to do so. And, to the extent any opt-ins have credible claims, they would likely benefit from having their claims tried separately from those class members with less- or non-meritorious claims.

## CONCLUSION

For all of the above reasons, this conditionally-certified collective is too large, too varied, and too inconsistent to survive and proceed as one matter and tried to one jury.  The prejudice and harm to Mercy greatly outweighs the (justifiable) inconvenience of each Opt-In Plaintiff needing to prove their claim and overcome Mercy's defenses with respect to each of them personally.  Now that the record evidence has been developed through the depositions of a representative sample of this collective and analysis of their (and the entire group of Opt-In Plaintiffs') time records and cancellation statistics, this Court should now decertify the collective so that the Named Plaintiff may proceed with her claim and any other Opt-In Plaintiff can pursue their individual claims.

Respectfully submitted,

*/s/ James M. Paul*
James M. Paul          #44232MO
Mallory S. Zoia         #70377MO
7700 Bonhomme Avenue, Suite 650
St. Louis, MO  63105
314.802.3935
314.802.3936 (*Facsimile*)
james.paul@ogletree.com
mallory.zoia@ogletree.com

Jeffrey L. Rudd          #6273373IL
155 N. Wacker Drive, Suite 4300
Chicago, IL  60606
312.558.1220
312.807.3619 (*Facsimile*)
jeffrey.rudd@ogletree.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 17th day of November, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Anthony M. Pezzani   52900MO
ENGELMEYER & PEZZANI, LLC
13321 N. Outer Forty Road, Suite 300
Chesterfield, MO  63017
636.532.9933
314.863.7793 (*Facsimile*)
tony@epfirm.com

Eric Sands (admitted *pro hac vice*)
Nicholas Conlon (admitted *pro hac vice*)
Jason T. Brown (admitted *pro hac vice*)
BROWN, LLC
111 Town Square Place, Suite 400
Jersey City, NJ  07310
877.561.0000
855.582.5297 (*Facsimile*)
eric.sands@jtblawgroup.com
nicholasconlon@jtblawgroup.com
jtb@jtblawgroup.com

**ATTORNEYS FOR PLAINTIFF**

*/s/ James M. Paul*
**AN ATTORNEY FOR DEFENDANTS**

93305363.v1-OGLETREE